**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FREDERICK L. ADAIR, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ABBOTT SEVERANCE PAY PLAN FOR | : |
| EMPLOYEES OF KOS | : |
| PHARMACEUTICALS, | : |
| | : |
| Defendant. | : |
| | : |

Civil Action No.
09-cv-3378 (NLH)(KMW)

**OPINION**

**APPEARANCES**:

Andrew P. Campbell, Esquire
John J. Delany, III, Esquire
Delany & O'Brien
161 N. Broad Street
Woodbury, N.J. 08096
*Attorneys for Plaintiff Frederick L. Adair*

James S. Richter, Esquire
Jeffrey P. Catenacci, Esquire
Winston & Strawn, L.L.P.
The Legal Center
One Riverfront Plaza
7th Floor
Newark, N.J. 07102
*Attorneys for Defendant Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals*

**HILLMAN, District Judge**

Plaintiff, Frederick L. Adair, seeks severance benefits, injunctive relief, and damages from Defendant, Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals. The severance plan at issue is an employee welfare benefit plan as described in 29 U.S.C. § 1002(2)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff moves for summary

judgment.  Defendant cross-moves for summary judgment.

For the following reasons, Plaintiff's Motion for Summary Judgment is granted in part and denied in part.  Defendant's Cross-motion for Summary Judgment is granted in part and denied in part.

## I.    JURISDICTION

Plaintiff has brought his claims pursuant to ERISA.  This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

## II.   BACKGROUND

Kos Pharmaceuticals ("Kos") was a manufacturer, distributor, and seller of specialty pharmaceutical products.  In 2006, it adopted the Kos Pharmaceuticals Change in Control Severance Plan, which provided severance benefits to a Kos employee who terminated his or her employment for "Good Reason."  (Administrative Record ("AR") at 22).  Among the suitable reasons to terminate employment under Kos' severance plan were if the employee suffered a material reduction in the total cash compensation that he or she was eligible to earn, or if the employee's job responsibilities or reporting relationships were significantly reduced or altered, respectively.  The actual relevant portion of Section I(o) of the severance plan defined "Good Reason" as:

> (i)   a greater than 10% reduction of the Participant's annual base salary, or any material reduction in the total cash compensation that the Participant is eligible to earn, from the level in effect immediately prior to December 15, 2006.

2

> (ii) any demotion or other significant
> reduction in the job responsibilities held by
> the Participant immediately prior to December
> 15, 2006, or any significant change to the
> reporting relationships of the Participant as in
> effect immediately prior to December 15, 2006[.]

(AR 4). Participants of the severance plan could receive cash payments, prorated annual bonuses, and other employee benefits, including health and welfare benefits, even after they terminated their employment for good reason.

In or around 2006, Adair was employed with Kos as an Associate Director of Quality Control. In December 2006, however, Kos was purchased by a larger pharmaceutical company, Abbott Laboratories ("Abbott"). Consequently, all of Kos' former employees, including Adair, became employees of Abbott or one of its subsidiaries. Moreover, pursuant to the parties' transaction agreement, Abbott agreed to maintain and administer severance benefits for any employees who were employed by Kos on December 15, 2006. Under Abbott, the Kos severance plan was renamed the "Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals" ("Severance Plan" or "Plan"). By the Severance Plan's own terms, the administration of the Plan was to be entrusted to the discretion of Abbott's Divisional Vice President, Employee and Labor Relations, who was designated as the Plan Administrator.

In a letter dated September 11, 2007, Adair notified Abbott that he would resign from his position within thirty days. He also explained that, by his estimation, the resignation was for "Good Reason" and entitled him to the severance benefits enumerated in

3

the Plan.  (AR 51).  In support of his claim, Adair cited a

material reduction in the total cash compensation he was eligible

to earn, a significant reduction in job responsibilities, and

significant changes in his reporting relationships.  More

specifically, Adair explained that Abbott's buyout of Kos reduced

his eligible compensation

> by restricting merit increases for 2006
> performance whereby the payout in April 2007 was
> not retroactive to January 2007; by prohibiting
> employees from participating in Abbott's cash
> profit sharing plan until the transition to
> Abbott benefits becomes effective on January 1,
> 2008; by not funding the Abbott Pension Plan for
> Kos Employees until January 1, 2008; by
> eliminating the bonus program for Kos Employees
> in 2007; by not providing bonus award
> compensation in the form of stock options or
> restricted stock; and by not having an Employee
> Stock Purchase Plan.

(AR 51).  With respect to his job responsibilities, Adair recalled

that his unit had been reorganized, a group from his unit being

realigned into another unit, and "with the resignation of [his]

Senior Manager," Adair's responsibilities became "primarily

tactical in function and the reporting structure within the Edison

Quality organization [became] a single person, direct line

relationship from Manager to Associate Director to Director to

Executive Director."  (AR 51).  In addition, he did not have any

input into his employees' bonuses.  For those reasons, Adair

believed he was entitled to severance benefits.

In a letter dated October 31, 2007, the Abbott Severance

Committee ("Committee") responded to Adair's notice and found that

he was not entitled to severance benefits because he voluntarily terminated his employment without good reason.  (AR 52).  With respect to a material reduction in total cash compensation, the Committee explained that "a participant does not experience a material reduction in the total cash compensation that he or she is eligible to earn unless the participant's total cash compensation, measured at target levels, is reduced by at least 10 percent."  (AR 53).  Further, the total cash compensation that a participant is eligible to earn, the Committee said, includes "base salary and target bonus."  (AR 53).  Based on those conclusions, the Committee calculated Adair's base salary and bonus for 2007 and found that in comparison to his total compensation for 2006, he actually was earning more in 2007.  As for his job responsibilities, the Committee informed Adair:  "Up until your resignation your job responsibilities continued to be Quality Assurance Management based at the Edison, NJ manufacturing site.  While your assignment at Abbott represents a change in job responsibilities, it does not represent a reduction in job responsibilities nor does it represent a demotion."  (AR 54).

Adair appealed the denial of his severance benefits in a letter dated November 11, 2007.  (AR 59).  He reiterated and bolstered the points he made in his resignation letter and articulated additional arguments.  Nevertheless, in a letter dated December 5, 2007, the Plan Administrator affirmed the Committee's decision and denied Adair's appeal.  (AR 83).  In particular, the

5

Administrator stated:

> Section I(o)(i) of the Plan states that any
> material reduction is based upon total cash
> compensation eligible to earn, not based upon
> past actual earnings.  Therefore, the Committee
> appropriately used bonus targets plus base
> salary as the method for calculating the amount
> eligible to earn.  Additionally, non-cash
> compensation such as stock options, restricted
> stock, pension funding, etc., were appropriately
> not included in the total cash compensation
> calculation.

(AR 84).  Consequently, the Administrator accepted the Committee's
financial representations and added that Adair did not provide "any
additional information that demonstrates that the Committee
incorrectly calculated [his] reduction in total cash compensation
that [he was] eligible to earn."  (AR 85).  Moreover, the
Administrator found that Adair had not suffered a significant
reduction or change in his job responsibilities.  According to the
Administrator,

> While there was a reorganization following the
> acquisition that did not constitute a
> significant reduction in job responsibilities
> nor did it constitute a demotion.  While I
> understand that you perceive that the
> resignation of a subordinate Senior Quality
> Control Manager had an adverse impact on you, in
> reality your level of job responsibility,
> reporting structure, job title and salary were
> not diminished.

(AR 85).

In or around July 2009, Adair filed the present suit in this
Court.  He moved for summary judgment in April 2010.  Abbott then
cross-moved for summary judgment.

**III. DISCUSSION**

6

### A.    Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative

evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Standard of Review for ERISA**

First of all, the parties dispute the appropriate standard of review for an ERISA case.  "[W]hen evaluating challenges to denials of benefits in actions brought under 29 U.S.C. § 1132(a)(1)(B), district courts are to review the plan administrator's decision under a de novo standard of review, unless the plan grants discretionary authority to the administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan."  Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989)).  In the event that the plan grants discretionary authority to the administrator or fiduciary, the district court must review the administrator's or fiduciary's decision for abuse of discretion.  Firestone Tire & Rubber Co., 489 U.S. at 115. However, if the administrator or fiduciary, endowed with discretion, harbors a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  Estate of Schwing, 562 F.3d at 525 (quoting Firestone Tire & Rubber Co., 489 U.S. at 115).

With respect to conflict of interest as a factor, Adair relies

on Third Circuit precedent when he suggests that a conflict of interest is not merely a consideration under the abuse of discretion standard, but rather alters the standard of review itself, sliding the scale of deference owed to the administrator or fiduciary depending on the degree of conflict.  Recently, however, the Third Circuit Court of Appeals explained that, in light of the Supreme Court's opinion in <u>Metropolitan Life Insurance Company v. Glenn</u>, 554 U.S. 105 (2008), the Circuit's former "'sliding scale' approach is no longer valid." <u>Estate of Schwing</u>, 562 F.3d at 525. Moreover, the Third Circuit held that "courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." <u>Id.</u> (citing <u>Glenn</u>, 554 U.S. at 115-16).  In other words, "[u]nder the arbitrary and capricious standard, the district court may overturn a decision of the plan administrator only if it is without reason, unsupported by the evidence, or erroneous as a matter of law." <u>Saltzman v. Indep. Blue Cross</u>, 384 F. App'x 107, 122 (3d Cir. 2010) (citation and internal quotation marks omitted).

     Accordingly, the Court must review Abbott's benefits denial for abuse of discretion if the Severance Plan grants Abbott, or its Plan Administrator, the discretionary authority to determine the

eligibility of benefits or to interpret the Plan's terms.  In this case, the Plan does just that.  In Section XXI of the Plan, it reads:

> Discretionary Authority.       The Plan Administrator is the named fiduciary of the Plan within the meaning of ERISA.    The Plan Administrator has the discretionary authority to interpret all Plan provisions and to determine all issues arising under the Plan, including issues of eligibility, coverage and benefits. The Plan Administrator's failure to enforce any provision of the Plan will not affect its right later to enforce the provision or any other provision of the Plan.   The Plan Administrator may delegate its responsibilities under the Plan.

(AR 14).  Adair does not contest that this provision grants the Plan Administrator the suitable discretion allowed under ERISA. Therefore, the Court must apply the abuse of discretion, or arbitrary and capricious, standard to the Administrator's decision to deny Adair certain benefits.  As part of its examination, the Court will consider whether the Administrator had any conflict of interest and to what degree, if any, that conflict may have contributed to an abuse of discretion.

## C.   Abuse of Discretion

To decide whether an administrator or fiduciary abused its discretion when interpreting the contract to an ERISA plan, a court must first determine whether the terms of the plan are ambiguous or equivocal.  Bill Gray Enters., Inc. Employ. Health and Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001).  Terms are ambiguous if they are subject to reasonable alternative interpretations.  Id.

"If the terms are unambiguous, then any actions taken by the plan administrator inconsistent with the terms of the document are arbitrary." Id. "But actions reasonably consistent with unambiguous plan language are not arbitrary." Id. "If the reviewing court determines the terms of a plan document are ambiguous, it must take the additional step and analyze whether the plan administrator's interpretation of the document is reasonable." Id. Under the deferential standard of review, "the Court's role is not to interpret ambiguous provisions de novo, but rather to 'analyze whether the plan administrator's interpretation of the document is reasonable.'" Brunswick Surgical Ctr., L.L.C. v. Cigna Healthcare, 2010 U.S. Dist. LEXIS 85043, at *14 (D.N.J. Aug. 18, 2010) (quoting Bill Gray Enters., 248 F.3d at 218); see also Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (noting that under the deferential standard of review applicable to ERISA, "the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits" (citation and internal quotation marks omitted)).

The Court will address each of Adair's challenges independently and in turn.

### 1.   Material Reduction in Total Cash Compensation

Adair argues that, as a result of Abbott's buyout of Kos, he experienced a material reduction in the total cash compensation that he was eligible to earn in 2007. As set forth in his appeal letter dated November 11, 2007, Adair asserted that Abbott's buyout

of Kos materially reduced his eligible compensation by

"eliminating, reducing, and not offering the following compensation

programs:"

> 1) The April 2007 merit increase payout for the 2006 performance was not retroactive to the beginning of fiscal year 2007;
>
> 2) Participation in Abbott's cash profit sharing plan at the minimum level of 5% had been prohibited until the transition to "full Abbott benefits" in 2008;
>
> 3) The company match 401K contributions were not fully vested;
>
> 4) Funding in the Abbott Pension Plan had been prohibited prior to January 2008;
>
> 5) The Kos Pharmaceutical bonus plan was not substituted with an Abbott Laboratories equivalent in 2007;
>
> 6) Equivalent bonus award compensation in the form of stock options or restricted stock for 2006 performance was not provided;
>
> 7) Abbott did not provide an Employee Stock Purchase Plan similar to Kos' plan;
>
> 8) The Abbott buyout of Kos increased by 5 percent my tax liabilities for 2006 by forcing my employee stock purchases and restricted stock ownership to be converted to cash.

(AR 60). Further, Adair explained that in 2006, he received a base

salary of about $115,000, a bonus of $25,000 in March, and a bonus

of $25,000 in December. In total, Adair calculated, his earnings

for 2006 amounted to approximately $165,042. According to Adair,

if he worked the entire year of 2007 with Abbott, he could have

earned a total amount of $120,265. The difference between his 2006

earnings and his potential 2007 earnings, by Adair's calculations,

constituted a net decrease of about 37% of his total cash compensation, warranting his receipt of severance benefits under the Severance Plan.  Moreover, Adair emphasizes that the Plan awards severance benefits based on a material reduction of the total cash compensation that an employee is "eligible to earn." The amount that he was eligible to earn, Adair contends, must include the amount that he <u>actually</u> earned the year before, and not be grounded in mere hypothetical formulas.  In addition, Adair again urges that a conflict of interest belies Abbott's decision-making and compounds its abuse of discretion.

Abbott counters that the Plan Administrator and the Committee correctly calculated the amount that Adair was eligible to earn and that the amount did not equate to a material reduction.  The Administrator and the Committee determined that Adair's current total cash compensation amounted to $140,130.95 -- $121,853 in base salary and $18,277.95 in bonus pay.  Having calculated Adair's total cash compensation for 2006 as $132,825 -- $115,500 in salary and $17,325 in bonus pay -- the Administrator and the Committee found that his total compensation for 2007 actually comprised a 5.5% increase over his 2006 compensation.  To reach this conclusion, the Administrator and the Committee interpreted eligible earnings to include base salary and target bonus, not past actual bonus earnings.  Abbott defends this interpretation, arguing that the plain language of the Plan specifies that the material reduction must pertain to the amount that an employee was "eligible

to earn," and not the amount that the employee actually earned in
the previous year.  Accordingly, Abbott surmises that the proper
measure of Adair's compensation was target levels and not actual
earnings.

In essence, the parties dispute whether Adair had "Good
Reason" to terminate his employment, the answer turning on an
acceptable interpretation of a portion of Section I(o)(i) of the
Plan: "any material reduction in the total cash compensation that
the Participant is eligible to earn, from the level in effect
immediately prior to December 15, 2006."  (AR 4).  At the outset,
the Court notes that the Plan Administrator and the Committee
interpreted "any material reduction in the total cash compensation"
to constitute a reduction of total cash compensation by 10%.  In
its October 31, 2007 letter denying Adair's request for benefits,
the Committee stated:  "This determination is based on a careful
comparison of the Kos and Abbott compensation structures and the
purposes of the Plan."  (AR 53).  Neither party appears to
challenge this determination, and in any event, the Administrator's
and the Committee's interpretation of the phrase "any material
reduction" is reasonable, and not arbitrary or capricious.

Similarly, in defining "total cash compensation," the
Committee decreed:  "Non-cash compensation such as stock options,
restricted stock, and Employee Stock Purchase Plan are not included
in the total cash compensation."  (AR 53).  The relevant phrase of
Section I(o)(i) expressly considers "total cash compensation."  A

14

plain reading of this language suggests that the Committee's interpretation, excluding from consideration any stock options or plans, is correct.  At the very least, even if "total cash compensation" is ambiguous, the Committee's interpretation and the Administrator's acceptance of it are reasonable, and not arbitrary or capricious.  For the same reasons, the lack of consideration given to Adair's purported tax liabilities also is reasonable. Lastly, the Court cannot say that the Administrator or the Committee acted arbitrarily or capriciously by excluding any consideration of several of the defunct or reduced compensation programs enumerated by Adair in his termination and appeal letters, especially given that Adair does not seem to valuate those programs and their effects on his total cash compensation.[1]  Therefore, to the extent that Adair claims that stock equity, tax liabilities, or other programs were unreasonably excluded from a determination of his total cash compensation, Abbott is granted summary judgment and that portion of Adair's claim is dismissed.

Notwithstanding the aforementioned matters, Adair believes a reasonable interpretation of Section I(o)(i), specifically the phrase "eligible to earn," must account for whatever amount of compensation Adair actually earned.  On the contrary, Abbott believes that "eligible to earn" simply means what it says and need

---

[1] The one program that Adair identifies as being eliminated altogether is Kos' bonus program.  However, Abbott represents that Adair may have been entitled to a bonus award of $18,277.95 in 2007.  The Court has no reason to doubt this representation, but will further address the bonus calculations below.

not consider any actual earnings.  Regardless of whether its
reading of the provision is the most reasonable interpretation,
Abbott urges that its conclusions must be affirmed so long as its
interpretation simply was reasonable.

The Court agrees with Adair that neither the Plan
Administrator nor the Committee adequately addressed his claims
that his total cash compensation was materially reduced.  It is
uncontroverted that Adair's base salary rose from approximately
$115,000 in 2006 to about $120,000 in 2007.  However, with regard
to his bonuses, there is a discrepancy between Adair's calculations
and those of the Administrator and the Committee.  Adair furnishes
some documentation in support of his claim that he earned about
$50,000 in bonuses in 2006.[2]  In their own calculations, the
Administrator and the Committee reduced Adair's 2006 bonus to
$17,325.  Their calculations also specify that Adair was eligible
to earn a bonus of $18,227.95 in 2007.  The only explanation
proffered by the Committee for its calculations is that "total cash
compensation" is "measured at target levels" and does not include
stock equity.  (AR 53).  Accepting the Committee's findings, the
Administrator noted that "total cash compensation" is based on the
compensation a participant is "eligible to earn" and not "past
actual earnings."  (AR 84).  The Administrator referred to and

---

[2] The Court notes that Adair is not consistent in describing
the actual total cash compensation he received in 2006.  However,
as we note in footnote 4, _infra_, it should be for the
Administrator, and not this Court, to make that factual
calculation in the first instance.

agreed with the Committee's calculations and added that Adair did not provide "any additional information" to demonstrate "that the Committee incorrectly calculated [Adair's] reduction in total cash compensation that [he was] eligible to earn."  (AR 85).

Based on this record, the Court finds that, regardless of the conflict of interest that may exist when "a plan administrator both evaluates claims for benefits and pays benefits claims,"[3] Glenn, 554 U.S. at 112, the Administrator abused its discretion in denying Adair's claim for severance benefits by virtue of his alleged material reduction in total cash compensation, without providing a more incisive review or substantive explanation for its decision. Without more, there is nothing before the Court to suggest that Abbott's decision is grounded in actual numbers and realistic circumstance.  Instead, it appears that the Administrator, and the Committee before him, adhered to the same reasoning and rationale that was rejected by the Court in Veltri v. Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals, 2010 U.S. Dist. LEXIS 5374 (D.N.J. Jan. 25, 2010).

In Veltri, the Court held that when interpreting the same "material reduction in total cash compensation" clause at issue here, the defendant abused its discretion by employing a hypothetical, "target" measure of the amount of compensation that the plaintiff was "eligible to earn." Id. at **9, 16-17.  The

---

[3] In light of the failure to adequately explain its decision, the Court need not address whether defendant's inherent conflict substantively affected the Administrator's decision.

Court stated that it could not understand how "the Plan Administrator's interpretation of 'eligible to earn' . . . make[s] sense or could achieve the type of fairness envisioned when the Severance Plan was established." Id. at *16.  It explained that "[w]ith regard to the 'eligible to earn' calculation of salary, it is a hypothetical compensation figure not based on actual facts to determine if an employee suffered a decrease of more than a ten percent reduction in pay." Id.  The Court continued: "Here, the Administrator failed to consider the actual cash compensation received by the employees prior to December 15, 2006.  The purpose of the Severance Plan is subverted when the Administrator adopts hypothetical formula instead of the actual circumstances faced by each employee." Id. at **16-17.  The emphasis on hypothetical target numbers at the expense of actual compensation undermined the Administrator's determination, the Court concluded.  Id. at *17.

Although this Court agrees with Abbott that Veltri is not precisely on point with this case, that case presents persuasive support for Adair's position that the Administrator did not adequately consider or distinguish Adair's argument concerning his reduction in pay.  Specifically, it is unclear why the Administrator, accepting the Committee's findings, determined that the proper "target" level of Adair's 2006 bonus was $17,325, more than $30,000 less than Adair identified as the amount he actually earned.  Whether the Administrator reasonably reduced the amount averred by Adair cannot be determined on the record because no

18

explanation is evident except that past actual earnings are not the proper measure to decide total cash compensation.  However, each claim for benefits must be decided on its own unique set of facts. Here, it is unreasonable that a hypothetical formula trumps past actual earnings without any further analysis or explanation to articulate how and why only a fraction of an amount actually earned will be credited in the calculations to determine a material reduction.

The Court does not suggest that the use of "target" levels may not be appropriate or at least reasonable under certain circumstances.  Simply put, the Court cannot say that the Administrator's decision was not arbitrary and capricious where it relies on undefined, hypothetical assessments to offset amounts that were actually earned by a Plan participant in order to justify the denial of severance benefits.  To the extent that the Administrator did not properly consider the full amount of Adair's 2006 bonuses or more thoroughly explain the reasons and methodologies for reducing that amount, the Court finds that the Administrator abused its discretion and that this case is to be remanded to the Administrator for further review consistent with this Opinion.[4]

_____

[4] On remand, the Plan Administrator should engage in the following analysis.  First, the Administrator should determine the total cash compensation Adair received for work performed in 2006.  This figure should include base salary and any cash bonus for that year actually received.  It would be reasonable to exclude from that figure any valuation or approximation of non-cash compensation such as stock options.  It would be

## 2.    Reduction in Job Responsibilities and Change in Reporting Relationships

Adair also argues that, as a result of Abbott's buyout of Kos, he experienced a significant reduction in his job responsibilities and a significant change to his reporting relationships.  As set forth in his appeal letter dated November 11, 2007, Adair enumerated the following changes to his employment subsequent to Abbott's acquisition of Kos:

> 1) the reorganization of the Edison QC unit from Technical Operations to the GPO Quality;
>
> 2) the business decision to realign the QCTS group under GPO-MST;
>
> 3) the resignation of my Senior Manager;
>
> 4) the change in the reporting structure of the Quality Control group;
>
> 5) my position responsibilities becoming entirely tactical rather than strategic in functionality.

(AR 61).  In particular, Adair explains that the reorganization of his unit eliminated half of his direct reports, diminished his

---

unreasonable, however, to substitute the "base salary-plus-cash bonus" figure with a lower figure calculated using a formula of bonus "eligibility."  Reasonable employers do not pay bonuses to employees who are not eligible to receive them.  Stated differently, actual pay should always be equal to or less than eligible pay, not the other way around.  Having computed that figure, the Administrator may then calculate the "base salary-plus-cash bonus" figure for 2007 based on what Adair would have been eligible to receive in 2007 if he had stayed with the company.  If the 2007 figure is more than 10% less than the 2006 figure, Adair should be entitled to benefits.  If the 2007 figure is higher or not more than 10% lower than the 2006 figure, the Administrator might reasonably conclude that Adair's resignation was not for good reason.

staff by 20%, and obviated a significant part of his job responsibilities.  Adair opines that the Plan Administrator merely accepted the Committee's perfunctory determination that he did not suffer any material reduction in his job responsibilities without reviewing the evidence presented by Adair.

Abbott challenges Adair's contentions as being mere conjecture and speculation based on personal perceptions, and suggests that while his job responsibilities may have changed, they were not materially reduced.  Abbott contends that Adair's job title remained the same and his salary increased, and that he continued to report to the same Director of Quality Control and had supervisory duties over approximately the same number of employees, even if the personnel and their duties may have changed.

Whereas the "material reduction in the total cash compensation" may be more easily quantifiable, the Plan's provision concerning a "significant reduction in the job responsibilities held by the Participant" or "any significant change to the reporting relationships of the Participant" are ambiguous by nature and certainly susceptible to multiple interpretations.  (AR 4). Thus, the Plan Administrator's determination that Adair did not sustain a significant reduction in job responsibilities or a significant change to reporting relationships need only be reasonable to constitute an appropriate use of discretion.  See Bill Gray Enters., 248 F.3d at 218.  The Court finds that the Administrator's determination was reasonable, and not arbitrary or

21

capricious.

After the merger between Abbott and Kos, Adair remained the Associate Director of Quality Control with the facility in Edison, New Jersey.  Despite the dispute over his total cash compensation, Adair's base salary increased.  He continued to report to George Toth, the Director of Quality Control.  While Adair points out that a part of his unit was transferred elsewhere, he assumed supervisory duties over a similar number of employees and positions.

Relying on the organizational charts in the record, it appears that before the merger, Adair supervised the Quality Control and Quality Control Technical Support groups ("QCTS").  Abbott determined that the QCTS should be renamed and moved to another unit.  In lieu of the QCTS, Adair assumed supervisory duties over another group of Quality Control chemists and other employees.  Further, after two of Adair's managers left his unit, two other individuals were promoted to managerial positions under his supervision.

Certainly, in light of the aforementioned decisions and transfers, Adair's job responsibilities changed, but that does not mean his job responsibilities were significantly reduced.  Similarly, there were alterations in Adair's reporting relationships, but given that he still reported to the same supervisor and maintained supervision over two managers and a number of other employees, the Court cannot say that his reporting

relationships were significantly changed.  Regardless of the exact
modifications in his professional role at Abbott, the Court must
defer to Abbott's reasonable interpretation of the Plan and cannot
find that it acted arbitrarily or capriciously.  Insofar as Adair
opines on the diminution of his job and its significance, or the
shift in its focus and nature, the Court cannot substitute Adair's
suppositions or its own for those of the Plan Administrator.  See
Abnathya, 2 F.3d at 45; see also Bader v. RHI Refractories Am.,
Inc., 111 F. App'x 117, 121 & n.5 (3d Cir. 2004) (affirming plan
administrator's denial of benefits, and finding that voluntary
termination was not for "'Good Reason,'" where employee retained
same title and salary and was subject to same reporting structure
because no evidence undermined administrator's decision except for
employee's "personal perceptions and conjectures").

Therefore, with respect to Adair's claims concerning his job
responsibilities and reporting relationships, Abbott is awarded
summary judgment and Adair's claims are dismissed.[5]

---

[5] Adair contends that both the Plan Administrator and the
Committee provided only cursory, superficial reviews of his
claims concerning the purported reduction in job responsibilities
and change in reporting relationships.  Certainly, the
Administrator and the Committee could have been clearer and more
thorough in their explanations.  Nevertheless, the Court finds
the record supports the reasonableness of the Administrator's and
the Committee's decisions, and the Court is not permitted to
present its own de novo determinations.  The Committee found that
Adair's job responsibilities changed but were not reduced.  (AR
54).  The Administrator, who had before him organizational charts
documenting the alterations made to Adair's chain of command,
acknowledged that "there was a reorganization following
[Abbott's] acquisition" of Kos and that Adair's "subordinate
Senior Quality Control Manager" resigned.  (AR 85).  Still, the

### D.   Statutory Damages

In Count III of his complaint, Adair requests statutory damages pursuant to 29 U.S.C. § 1132[6] for Abbott's failure "to provide documents which [Abbott] was requested to provide pursuant to 29 U.S.C. § 1133." (Complaint at 9).  The only averment in Adair's complaint to support his cause of action states:  "The Plaintiff requested from the Plan Administrator and the Plan documents necessary to properly evaluate and investigate his appeal and appeal rights.  The Plan failed and refused to provide documents and information required to be provided or necessary to effectively appeal the denial of benefits." (Compl. at 7).

Abbott moves for summary judgment against this claim, contending that it provided Adair with the documentation he requested.  To the extent that any documentation was not provided

---

Administrator concluded that "in reality your level of job responsibility, reporting structure, job title and salary were not diminished." (AR 85).  In light of those determinations and the deference accorded to them, there is no basis to find that an abuse of discretion occurred.

[6] ERISA section 502(c)(1) provides, in relevant part:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 per day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1).

to Adair, Abbott notes that the failure to provide was not caused by bad faith, intentional misconduct, or any malfeasance.

The record seems devoid of any evidence illustrating Abbott's alleged shortcomings to provide documentation.  On the contrary, the record includes correspondences between the parties showing that Adair requested and received the "Legal Plan Document" pertaining to the Severance Plan.  (AR 87-139).  Further, Adair does not appear to retort Abbott's argument against this claim or in any way demonstrate that Abbott or the Plan Administrator actively withheld information in bad faith or with the intent to thwart Adair's pursuit of severance benefits.  See Romero v. SmithKline Beecham, 309 F.3d 113, 120 (3d Cir. 2002) (explaining that a determination of damages should be assessed only after considering several factors including "bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary" (citation and internal quotation marks omitted)).

Therefore, because no persuasive argument or evidence is proffered in response to Abbott's motion against this claim, and the record appears to support Abbott's assertion, summary judgment is granted and Adair's request for statutory damages is dismissed.

**IV.**  **CONCLUSION**

For the foregoing reasons, Adair's Motion for Summary Judgment is granted in part and denied in part.  Further, Abbott's Cross-

motion for Summary Judgment is granted in part and denied in part. This case will be remanded to Abbott's Plan Administrator for further review in accordance with this Opinion.  An Order consistent with this Opinion will be entered.


Dated: February 24, 2011          /s/ NOEL L. HILLMAN
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.